IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 15, 2011 Session

IN RE ANGELICA S.

Appeal from the Juvenile Court for Roane County
No. 20069    Dennis W. Humphrey, Judge

No. E2011-00517-COA-R3-PT-FILED-OCTOBER 4, 2011

This is a termination of parental rights case focusing on Angelica S. ("the Child"), the minor daughter of Irene S. ("Mother") and Jose S. ("Father"). When the Child was five, Mother left her with Father. Mother never returned. Father, an illegal immigrant, subsequently married Melissa S. ("Stepmother") and made her the Child's legal custodian. In 2009, the Department of Children's Services ("DCS") took custody of the Child after the Child alleged that Stepmother had abused her. The following year, DCS filed a petition to terminate the parental rights of Mother and Father.[1] Following a bench trial, the court granted the petition after finding, by clear and convincing evidence, that both parents had abandoned the Child by failing to visit her in the relevant four-month time period and that termination is in the Child's best interest. Father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, Jose S.

Robert E. Cooper, Jr., Attorney General and Reporter, and Benjamin A. Whitehouse, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]Mother was served with the petition, but did not file an answer or appear at trial. She is not a party to this appeal and we refer to her only as is necessary to present the relevant underlying facts.

Amy Ruther Callis, Knoxville, Tennessee, Guardians ad Litem.[2]

**OPINION**

I.

The Child was born in Indiana on July 13, 1997. Mother and Father were never married. According to Father, he discovered early in their relationship that Mother used drugs, had many aliases, and her "whole life," as he knew it, "was all lies." As a result, Father left Mother when the Child was only a week old. According to Father, he was unable to take the Child away from Mother because he is not a legal United States citizen. When the Child was still an infant, Father was deported to Mexico. He managed to cross the border again and return to this country a short time later after Mother called and told him that the Child was ill. Father moved to Kentucky and Mother followed, but their relationship soon ended for good. Nonetheless, they both returned to Indiana and took turns at caring for the Child. When the Child was five, Mother left her with Father; she never returned. As of the time of trial, Father had not seen or spoken to her since she left.

Father moved to Alabama, where he had relatives, and married Stepmother. He allowed Stepmother to obtain legal custody of the Child so that the Child could attend school. Father and Stepmother had two children together and the family, including the Child, moved to Tennessee in 2008. During that year, Father and Stepmother separated. While Father moved in with a friend, the Child stayed with Stepmother. Father returned to Stepmother's house several days a week to help care for the children. In January 2009, DCS became involved after the Child reported that Stepmother had abused her – specifically, that Stepmother had punched her in the face and hit her with a wire coat hanger.

On January 27 and 28, Father and Stepmother attended "child and family team meetings" at DCS to discuss the abuse allegations and how best to achieve permanency for the Child. A caseworker noted that Stepmother was uncooperative; the worker also stated that Father told DCS staff that he was the Child's uncle. At trial, Father explained that he lied at that time because he feared he would lose custody of his other children if he were to be arrested as an illegal alien and again deported. The following day, the Child was ordered into temporary, protective custody.

Father acknowledged that DCS initially informed him and Stepmother that Stepmother could regain custody if she took certain steps such as completing parenting classes and an

[2]In this appeal, Ms. Callis, on behalf of the Child, joins the brief of Father, but, in her motion to join in, she limited her agreement with Father's position.

assessment to deal with her "inappropriate discipline issues." Before the Child was removed, Father was at Stepmother's house and had questioned the Child about bruising under her eye. The Child told him that "Billy" had pushed her and she hit her cheek on the corner of the bed. Father was aware of DCS's finding that Stepmother had inflicted the injury, but did not believe the report. Father explained that he had never witnessed any abuse and knew the Child loved Stepmother. Father said that, as a Christian, he intended to stay married to Stepmother because they had children together. Father reasoned that Stepmother would take the necessary steps to get the Child back since he himself "was not able to fight for her." Stepmother, however, suffered a nervous breakdown after her own mother became sick and died. Stepmother never made an effort to regain custody. In March 2009, the Child was adjudicated dependent and neglected based on Stepmother's stipulation to the charges of abuse. Custody was awarded to DCS.

In the ensuing months, there were a few calls to, and visits by Stepmother with, the Child, but no contact between the Child and Father. On April 20, 2010, DCS filed a petition to terminate the parental rights of Father and Mother. Ms. Edmonds, who did not become the Child's caseworker until June 2010, noted that DCS was mandated to seek termination because the Child had been in the Department's custody for more than a year with no progress made toward permanency by anyone, *i.e.*, Mother was never located despite a diligent search in several states; Father had no further contact with the Child or DCS since the Child entered foster care; and Stepmother had completed none of the requirements in the permanency plan. Edmonds added that there was no compelling reason not to terminate – the Child was "just simply standing in limbo. . . ."

Edmonds agreed that before the petition was filed, DCS had reason to believe that Father was the Child's biological father, including the fact that he was married to Stepmother, the Child's custodian, and that DCS had obtained a copy of the Child's birth certificate that listed "Jose S." as the father. She testified that Father's identity could not be conclusively confirmed. At the first team meetings, Father not only denied he was the Child's father, but said his name was actually "Jacinto S." Edmonds explained that despite their suspicions, Father maintained that he was the Child's uncle, prompting DCS to undergo a search for the named father, "Jose S," who they assumed was married to Mother.

Consistent with Edmonds' testimony, Father conceded he made no further contact with the Child or anyone at DCS from the time the Child entered foster care in January 2009 until the summer of 2010. Around June 2010, the Child told her foster mother that Father was actually her father. The foster mother tracked down Father and advised him that his rights were about to be terminated and he should fight for the Child. The following month, a DCS worker attempted to meet with Father at Stepmother's house, but she advised him that Father did not live there but she knew how to reach him. According to Father, he began

making calls to Edmonds to ask about the Child, but never got a response. Edmonds disputed Father's claim; Edmonds said that Father had left her some messages and she had attempted to return each call, but never once reached Father directly because he shared a cell phone with Stepmother. Instead, she was forced to rely on Stepmother to relay her messages. The worker also testified that Stepmother was difficult to reach and had no voicemail. Edmonds said the situation improved when Father obtained his own cell phone.

Trial on the pending petition was initially set for August 2010. Edmonds repeatedly scheduled meetings with Stepmother to review the Child's permanency plan but a meeting never took place until August 2 when Stepmother and Father met with Edmonds and her supervisor at DCS. At the meeting, Father, for the first time, informed DCS that he was in fact the Child's father; he told them he wanted custody. Asked about his lengthy lack of contact with DCS regarding the Child, Father told Edmonds that he had moved and never received notice that a petition to terminate had been filed. Both Father and Stepmother acknowledged, however, that Father sometimes lived with Stepmother and that she had received the notice. Edmonds discussed with Father the steps he would need to take to obtain custody and reviewed the grounds for termination of his parental rights. Edmonds specifically advised Father of the requirement that he have more than token visitation with the Child. In all, Father had three visits with the Child from the time she first entered DCS custody in January 2009 until the time of trial in January 2011, all of them coming months after the petition was filed.

Later in August, Edmonds scheduled a meeting to arrange for Father to have supervised visits with the Child, but Father did not attend. Father said he "did try a few times" to find out how to secure visitation, but Edmonds never called him back. At the same time, Father conceded that Stepmother had informed him "quite a few times" that Edmonds had called to speak with him. Father conceded it would have been better for him to return to the office of DCS and arrange visits in person after telephone communications proved difficult. Edmonds was aware that Father and the Child had been speaking by telephone during the past few months.

Before Christmas 2010, the Child expressed a desire to be adopted; she told Edmonds that "she did love [Father], but she didn't feel that he would leave [Stepmother] in order to care for her" and said she wanted nothing to do with Stepmother. Edmonds explained that DCS always tried to place a child with family first, and said that even at the time of trial they were still willing to try to place the Child with another relative – Father's brother or his parents in Mexico – if this was feasible and legally possible.

At the time of trial, Father spent half of each week at Stepmother's house helping to care for their children and the rest of the time he lived with a roommate. Father worked odd

jobs such as farming, mowing, or cleaning, and said it wasn't easy, but he was always able to find work to support his children. Questioned regarding what would happen to the Child if he gained custody and was again deported, Father suggested that the Child could live with his parents.

At the time of the January 2011 trial, the Child was 13 and had been in DCS custody for two years. The Child was sworn and permitted to testify by telephone. Essentially, she told the court that she knew Father loved her, but that he didn't want to leave Stepmother and his other children. The Child concluded that it would bother her if she got "taken away" from Father, but "not as much as it would . . . if [her] whole family would be [taken] away." She requested that either Father's brother or her grandparents be given "a chance."

At the conclusion of the hearing, the trial court terminated the parental rights of Father and Mother based upon its finding that both parents had abandoned the Child by engaging in only token visits during the four-month period immediately preceding the filing of the termination petition.

Father timely filed a notice of appeal.

II.

Father presents the following issues for our review:

> 1. Whether the trial court erred in terminating his parental rights when the record was insufficient to establish that Father's failure to visit the Child was willful.

> 2. Whether the trial court erred in terminating his parental rights in view of the fact that DCS failed to exert reasonable efforts to reunite the family.

> 3. Whether the trial court erred in terminating his parental rights when DCS failed to prove that termination was in the best interest of the Child.

III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

A.

Father challenges the trial court's determination that he abandoned the Child. He contends (1) that his failure to visit the Child was not willful, and (2) that DCS failed to exert reasonable efforts to assist him to provide a suitable home for the Child and reunite the family. We address these issues in turn.

B.

The trial court terminated Father's rights on the ground that he abandoned the Child. Tenn. Code Ann. § 36-1-113 (g)(1)(2010) provides, in relevant part, as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection. . . .
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Section 36-1-102(2010), referenced above, defines the ground of abandonment, as relevant to the present case, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment'" means that:
>
> * * *
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child. . . .

Under subsection (1) of Section 36-1-102, "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). In the present case, the relevant four-month statutory period for establishing abandonment by failure to visit is December 20, 2009 to April 20, 2010, the date the termination petition was filed.[3]

C.

In its bench ruling, trial court concluded that the ground of abandonment had been established as follows:

> As to [Father], four months of no contact is all it takes. And when that is proven, that is grounds for termination of parental rights. But this Court, and I think other courts, would consider what happens after that. Was there a reason for it?
>
> In this case, it's apparent one of his reasons was that he had some fear of deportation. He had fears of losing his other children. But what's foremost in the Court's mind, what has to be, is the welfare of the [C]hild. So the State did prove that he didn't have that contact for the four months.
>
> And thereafter from the proof that I've heard today, even when he knew that these proceedings were going forward, that he only saw this [C]hild three or four times in the past year. And that is only token visitation.
>
> And so it appears to be the [C]hild's wishes, and making she's taking one for the team, it sounds like, to preserve this family, and she had expressed her preference, and I hope the State will consider that.
>
> But the Court feels that there is abandonment, as described, that there was reasonable efforts made to preserve the family. And the State was unsuccessful, but certainly attempted to do that.

---

[3]DCS incorrectly asserts that "the relevant four-month period is between January 19, 2010, and April 19, 2010," a period of only three months.

-8-

And in regards to both parents, it's in the best interest of the [C]hild that parental rights be terminated.

### D.

It is undisputed that Father did not visit or have any contact at all with the Child for over 15 months after she entered DCS custody, through and including the critical four months immediately preceding the filing of the April 2010 petition. Father asserts that the "only issues remaining are whether [he] made any attempt to visit and whether [he] has a justifiable excuse for not visiting. . . ." Father concludes that the answer is "yes" on both counts. We disagree.

The proof shows that the extent of Father's "attempts" to visit before the petition was filed was a few phone calls to someone at DCS at a time when he continued to maintain that he was not the Child's father. He alleges his calls were not returned and, apparently, he dropped the matter. In our view, the proof shows that Father sat by silently and relied on Stepmother to regain custody, but that did not happen. Father continued to keep silent, having no contact with the Child or DCS, while DCS undertook a search for both parents so that they could begin to work toward permanency for the Child. In short, Father failed to pursue visitation "until [he] realized that [he] was doing wrong," after termination had become a real possibility.

In August 2010, after Father admitted that he was the Child's father, he was provided contact information for establishing visitation, either through Edmonds or the Youth Villages agency where the Child was then placed. DCS also developed a parenting plan for him that addressed income, housing, and stability in general and allowed supervised visitation. According to Edmonds, Father's "biggest problem" was his lack of consistency in visiting or maintaining any contact with the Child. Yet even after Edwards discussed with him the need for regular visits in order to avoid termination, Father visited only three times in the next five months until trial, and only one of those was a supervised visit as required. In all, Father had three visits with the Child from the time she entered DCS custody until the time of trial, none of them during the critical four-month period.

Father further asserts that his fear of being deported and losing custody of his other children provides him a "justifiable" reason for failing to visit the Child so that his lack of contact with her cannot be deemed willful. Again, we disagree. Certainly, Father's status as an illegal immigrant is not a ground for terminating his rights to his Child. Neither, however, does it legally excuse him from meeting his parental obligation to spend time with the Child. In an analogous situation, this Court has rejected a parent's argument that his

failure to visit was not willful. In **In re Shipley**, No. 03A01-9611-JV-00369, 1997 WL 596281, at *4 (Tenn. Ct. App., E.S., filed Sep. 29, 1997), we observed:

> [Father's] second reason for not visiting -- because he "was on the run" from law enforcement -- even if true, is a problem of his own making. As such, it can hardly serve as a legal basis for his failure to visit. He could have visited had he chosen to do so; he chose not to.

Moreover, in the present case, once he realized the gravity of the situation, Father effectively came out of "hiding" – despite the fact that his immigration status had not changed – and initiated contact with DCS and the Child. This does not change the fact of his earlier abandonment of the Child, however. *See* Tenn. Code Ann. § 36-1-102(1)(F)(providing that "[a]bandonment may not be repented of by resuming visitation . . . subsequent to the filing of any petition seeking to terminate parental . . . rights. . . .").

In summary, the evidence does not preponderate against the trial court's finding that Father failed to visit the Child during the critical four months immediately preceding the filing of the termination petition and that his decision to abandon contact with the Child was willful. The trial court did not err in terminating Father's rights on this ground.

E.

As we have discussed, DCS pursued termination in this case on one ground – its petition expressly cited "Abandonment - Failure to Visit," – and the trial court found the existence of that sole ground by clear and convincing evidence. Confusingly, however, Father devotes much of his brief to his argument that the trial court erred in terminating his rights based on another, separate ground of abandonment – the failure to establish a suitable home for the Child pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(ii). Under that section, "abandonment" occurs where a child is removed from the home of a parent or guardian in which it was found to be dependent and neglected and, "for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." *Id*. Father concludes:

> For the Department to prevail on termination in the instant case it must prove the existence of three essential elements – that the Department made reasonable efforts to assist the parents, that

the parents have made no effort to provide a suitable home, and that termination is in the best interest of the minor child.

As discussed, above, termination was based on abandonment as a result of Father's failure to visit the Child. In view of our conclusion that there is clear and convincing evidence to support the trial court's decision, we need not further address this argument focusing on a ground that was neither alleged by DCS nor found by the trial court. Lastly, "[t]he existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights." ***In re C.W.W.***, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) ( *abrogated on other grounds,* ***In re Audrey S.,*** 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

V.

Having determined that a ground for termination was clearly and convincingly established, we next consider whether there was also clear and convincing evidence showing that termination is in the Child's best interest. We are guided by the non-exclusive list of factors set forth in Tenn. Code Ann. § 36-1-113(i):

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

There is no requirement that each of these factors must appear before a court can find that termination is in a child's best interest. *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006)(citing *Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 WL 970434, at *3 (Tenn. Ct. App. M.S., filed May 10, 2002)).

At the conclusion of the trial, the court stated, in relevant part:

The Court finds the termination of the [Father's and Mother's] parental rights to the [C]hild is in the best interest of the [C]hild. Testimonial evidence proves [Father and Mother] have not maintained regular visitation with the [C]hild. [. . . .]. There is no meaningful relationship with . . . [F]ather and [C]hild for the period the [C]hild entered foster care and until the filing of the termination petition. [Father and Mother] have shown little or no interest[] in the welfare of the [C]hild. [F]ather has not provided for the support of the [C]hild (paying no child support), . . . [F]ather has not completed a single request on the permanency plan (or provided evidence of such), and . . . [Father] has not provided a suitable home for the [C]hild.

The [C]hild testified that she would like to find permanence in the home and care of relatives, not . . . [F]ather.

The evidence does not preponderate against the trial court's findings. The trial court correctly pointed to the fact that Father essentially allowed the Child to be placed in foster care and failed to maintain any contact with her for the next 17 months for reasons that were in his own self-interest but certainly not in the Child's. Father went so far as to actively deny to those working to help the Child that he was the Child's father, a lie he acknowledged was a "big mistake" and one that he felt had broken the Child's heart in the process.

It appears that Father was content to remain silent and do nothing – leaving the Child "in limbo," as Ms. Edmonds put it – until the petition was pending for several months and he decided to become "serious" about trying to regain custody. In our view, the trial court's findings reflect its conclusion that this was simply "too little, too late" after Father had abandoned the Child for so long. For her part, the 13-year-old Child's testimony indicated a recognition that Father had essentially chosen Stepmother and their children over being a parent to her. She expressed a hope that she could find stability and permanence with other relatives instead. Edmonds indicated that DCS's first priority was always to allow a child to live with family and she was willing to meet the Child's request if at all possible.

The evidence clearly and convincingly establishes that severing Father's rights is in the Child's best interest. Accordingly, the trial court did not err in granting the petition.

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Jose S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

-13-